55 So.2d 181 (1951)
KING
v.
KING et al.
Supreme Court of Florida, Special Division B.
November 16, 1951.
Rehearing Denied December 12, 1951.
John H. Carter, Jr., Marianna, for appellant.
Yonge, Beggs & Lane, Pensacola, Frank Hendrix and John B. Amos, Fort Walton, for appellees.
THOMAS, Justice.
The matter here to be determined is the ownership of a savings account created by Thomas M. King, now deceased, who was the son of the appellant and the husband of the appellee. The latter, as administratrix, contends that the money on deposit constitutes an asset of the estate, the former that it was a gift to her inter vivos.
The origin and history of the account are important to a decision of its status at the time Thomas M. King died. In October, 1939, he had opened a checking account in the name of his mother, Mrs. Martha E. King, but both mother and son were authorized to make withdrawals as was indicated by a signature card bearing both names, affixed, however, in the handwriting of the son. Only six checks were drawn against this account, five signed "Mrs. M.E. King By" and one "Mrs. M. King Per Thomas M. King." The last check, for $500, closed the account and was used, with an additional $100, to open a savings account, also in the name of the mother. A deposit of $100 was later made and then in September, 1941, this account was discontinued by a check signed "Mrs. M.E. King By Thomas M. King."
The third account was opened by the son in the name of his mother, in January, 1942, with a check for $1,000 on a bank in another city.
In October, 1945, a fourth account was created in the same way by a deposit of $4,500, which was subsequently increased to something over $10,000, and this balance was, 29 June 1949, transferred to the third, or savings, account with which we are presently concerned.
It is significant that on 11 December 1939 Martha E. King was pronounced insane and a decree declaring she had regained her soundness of mind and the capability of managing her own affairs was not entered until 23 August 1946. So all of the activities with reference to the four accounts from shortly after the establishment of the first until after the creation of the fourth occurred while she was mentally incompetent. The son dealt with all the accounts as if they were his own, opening three of them, and closing two, while his mother was thus incapacitated. There is evidence that he eventually delivered the pass book to her, but this seems not to have impeded him in the least in dealing with the accounts as he pleased.
*182 There is plenty of evidence, too, that he expressed on frequent occasions great devotion to his mother and showed commendable solicitude for her happiness and comfort should his life end before hers, but fine as these motives were, the question of whether he made an outright gift to her of the bank balance must be determined by the application of the rules we have often recognized governing such transactions.
The fineness of such a purpose cannot obviate the rules controlling devise of property, or gifts causa mortis or inter vivos. There is no need to discuss any but the last of these. In fact, the appellant raises only the question of whether the gift here attempted was of that character.
The so-called gift seems to lack the elements we have held vital. Jones v. Ferguson, 150 Fla. 313, 7 So.2d 464. There must be a delivery to the donee and an intention of the donor to relinquish dominion over the subject. Assuming that by handing to his mother the bank pass book the son sincerely intended delivery, it is obvious from his subsequent actions as described by the witnesses the chancellor heard that this could have been only a gesture. As for his surrendering dominion, these same actions contradict such an intention. At the very time the savings account was created the mother had been in the hospital for the insane more than two years and she remained there for more than three years afterward. Yet all this time the son dealt with the accounts he was creating and closing precisely the same as if they were entered on the bank books in his name instead of hers.
There is much testimony to indicate her attitude and his with reference to the accounts, but we see no occasion to review it here because the actual conduct of the son is eloquent evidence of the fact that he did not actually deliver the account to his mother or surrender control of it.
The only semblance of perfection of the gift, by delivery of the pass book as a token, came before the mother was declared sane and about three years after the account was opened. We have not detected such a change at that time in the pattern of the son's dealing with the deposits as would justify the conclusion that at the particular moment of delivery the son made an outright transfer of title and abandoned any further control over the money.
We think the chancellor was correct when he held that no gift inter vivos had been shown.
Affirmed.
SEBRING, C.J., and TERRELL and CHAPMAN, JJ., concur.