RAWLS, Judge.
The decree herein appealed from was entered in an action brought by Norton Josephson, as ancillary administrator of *441 the estate of J. George Kummer, against Evan T. and Thelma Kuhner seeking to recover for the estate, funds of J. George Kummer which in the last days of Mr. Kummer’s life had been transferred into joint accounts in the names of J. George Kummer and Evan T. Kuhner with right ■of survivorship.
Three separate and distinct transfers of bank accounts, each account being in the principal sum of $10,000 are involved in this •cause. The appellees insist that the transfers constituted a valid gift with survivor-ship in appellee, Evan T. Kuhner, while appellant claims that such transfers did not constitute valid gifts. For reasons hereinafter enumerated, we find that the Chancellor erred in holding such transfers to be valid gifts.
The evidentiary matters presented to the Chancellor are important in reaching our decision.[1] References will sometimes be made to appellee-defendant, Evan T. Kuhner, as "Kuhner” or as “donee” and to decedent, J. George Kummer as "George” or as “donor”. The factual background is that the alleged donor, J. George Kum-mer, an eighty-one year old man, was one of five sons in a family of German descent. During their working years all of the brothers had at one time been engaged in the business of retail meat marketing in Butler, Pennsylvania, which was owned by George Kummer and his brother, Fred. George, who had no wife or children, often lived with or visited with other members of the family. George was dependent upon Fred’s business acumen for the accumulation of his estate, kept his holdings in Fred’s name, and in the fall of 1957, received final settlement of his funds from Fred’s estate. For several years prior to his death, George had lived in rooming houses in Pennsylvania during the summer and rented a room from the appellees in Daytona Beach, during the winter.
The administrator adduced testimony from George’s family, that in the fall of 1957, George had agreed to spend the winter in Butler with his brother Al, but that after receiving a letter which George described as a “hot one from his girl friend,” and over his family’s protests, he drove to Daytona Beach, Florida; that George took about $30,000 with him; that George was unclean in his habits, was miserly but liked to flash his money and tell about his possessions and savings, registered and posed as a physician, and had other peculiar habits, such as urinating in a water glass and storing same in his bedroom furniture. George rented a room from the appellees and stayed there until March 25, 1958, on which date he was examined by a physician (Dr. Herbert A. King) and was placed in a hospital at Daytona Beach, where he remained until his death on April 27, 1958. During the last ten days of George’s life and while confined in the hospital, he signed cards authorizing transfer of three savings accounts into the names of J. George Kum-mer and Evan T. Kuhner, with right of survivorship. On April 28, 1958, (one day after George’s death) Kuhner withdrew the funds from one account and deposited same in accounts in the names of Evan T. Kuhner and his wife, Thelma J. Kuhner, and two days later closed the other two accounts in the same manner.
The signature cards authorizing transfer of the three bank accounts were signed by George Kummer between April 17, 1958, and April 27, 1958. The hospital records reflect that upon admission, George Kum-mer was described as “ * * * a slightly confused dirty old white male with a partially fused left hip who walks with a limp and complains of pain across the low back. He is extremely vague.” During the period of time preceding his signing of the signature cards (March 25-April 17), the hospital records reflect that George Kum- *442 mer fell out of his bed and injured himself, that on occasions side rails and a fish net were used on his hospital bed, at times that he was “fairly alert” and at other times confused, sleeping at long intervals, was given percodan tablets (a synthetic agent like codeine), and at times was sitting up and walking with assistance for short periods, and was progressively getting weaker. George signed the several transfer cards during the period April 17-April 27, the latter being the date of his death. During this period a marked difference in his physical and mental condition was revealed by the nurses notes, which in substance reflected that side rails and fish net were used almost continuously, per-codan given daily, and a description of George Kummer’s condition as “confused”, “stuporous”, “disoriented”, “shouting”, “calling loudly”, “moaning” and “groaning”.
The attending physician (Dr. King) testified that even though he had diagnosed George’s ailments as “angina pectoris”, “might well have pernicious anemia”, “arthritis” and “uremia”, and did on April 22 place him on the “critical list”, that he did not expect George to die from these illnesses as suddenly as he did and did not think that George was anticipating death. The physician further testified that even though he had described George as being “vague”, “confused” and “senile”, that in his opinion George had sufficient mental capacity to take care of his business. On cross examination, the physician testified that he did not know that George Kummer possessed large sums of money; that it was his understanding that money would be put into a bank so Mr. Kuhner could pay George Kummer’s medical bills; that he didn’t think the man -was going to give away his money or do any odd thing, and that it was his understanding that Mr. Kum-mer planned to live with and “be taken care of” by Mr. Kuhner.
It was against this background that Evan T. Kuhner arranged for the signing of the transfer cards in each bank account, changing them from the name of J. George Kum-mer to the names of J. George Kummer and Evan T. Kuhner, with right of survivor-ship. Significantly, other than medical personnel, the record does not indicate that any person visited or conversed with George Kummer during his hospital confinement, save Evan T. Kuhner and his wife.
After consideration of the proofs presented by each party, the Chancellor entered a final decree dismissing the administrator’s complaint.
Appellant raises three points, viz.:
(1) Where a person is named in a joint bank savings account with right of sur-vivorship with a deceased person, is the survivor competent to testify as to the transaction creating the account ?
(2) Where three transfers of savings accounts to a joint account with right of sur-vivorship were made within a ten day period prior to death and competent evidence presented showed that during such transfer period the donor could have been disoriented, vague, and confused, did the burden of proof shift from the appellants to appellees to show that the transfers were made during a lucid interval of .the donor?'
(3) Where it has been shown by un-contradicted competent evidence that two transfers of savings accounts from an individual account to a joint account with right of survivorship, were made for the purpose of paying bills, and a third account was transferred from an individual account to a joint account with right of survivor-ship, because the donor desired to have the donee’s name thereon “in the event of death”, was the presumption that the transfer to a joint account was a gift, sufficiently rebutted so as to set aside said transfers?
The administrator’s first point goes, to the application of Section 90.05, Florida Statutes 1957, F.S.A., commonly known as; the “Dead Man’s Statute”, which provides in substance that a person interested in an event cannot testify as to transactions or *443 communications with a decedent. It is appellant’s position that the Chancellor erred in considering the testimony of the donee because such testimony violated the Dead Man’s Statute. Standing alone, this position is well taken. However, an interested person may waive the provisions of the statute, by opening the door as to •communications with the deceased. Ben Kummer, a brother of decedent, an heir at law, and, therefore, an interested person within the terms of the statute [2] testified as to the close family relationship between decedent and his brothers, and on direct •examination testified as follows:
“Q. Did your brother J. George Kummer ever mention the defendant, Evan T. Kuhner?
“A. Yes he did. We was talking one night out on the bench in the back yard. Got to talking about Evan Kuhn-er, and he said, ‘That guy is a fox. You know what I mean, he’s a schurkii.’
“Q. What does that German word that you used mean ?
“A. Two-faced.”
Such testimony was clearly directed toward establishing the mental attitude of the donor to the donee and, therefore, constituted a waiver by the interested person of the statutory provisions. To allow an heir at law to testify as above, without permitting the donee to testify as to communications with decedent, would give the heir at law a distinct advantage over the other interested party. This jurisdiction has long settled such a proposition in holding that under such circumstances the provisions of the statute are waived.[3] The Chancellor was •correct in considering the testimony of the donee.
We now go to the administrator’s second and third points, which will be considered together.
In dealing with gifts, this jurisdiction has considered the question of burden of proof in a number of cases, and has held that in some instances the burden rests upon those receiving the gifts and in other instances upon those questioning the gifts. These cases seemingly are bottomed upon the facts surrounding the gifts, the nature of the gifts, and whether or not they are gifts inter vivos or gifts causa mortis.
In Booth v. Cureton [4] the Supreme Court considered the question of a gift of furs and jewelry by the donor within approximately ninety days prior to her death. Upon which party the burden of proof was cast, was a key point involved in the litigation. The Chancellor, after finding that the donor was addicted to drink, and drugs in the form of sleeping pills, but that she was not addicted to the point of being unbalanced and incompetent, save for short intervals of overindulgence, held: “The parties claiming [such] a gift, in such a case, (emphasis supplied) have the burden of establishing the legal requirements for validity and effectiveness of the gifts, not only by preponderance of evidence, but by clear, positive and satisfactory proofs.” In affirming the Chancellor, the Supreme Court held that under the circumstances casting the burden upon the donee was not an unreasonable requirement. The circumstances in the Booth case and the instant case are analogous to a great extent, i. e. there, one of the donees was the donor’s housekeeper; here, the donee is the donor’s landlord; there, the gifts set aside were made within ninety days prior to donor’s death; here, the transfers were made within ten days prior to donor’s death during a period of time that donor was in critical condition; there, the donor was not unbalanced or incompetent but there may have been brief periods of incompetency; here, the donor was being administered drugs, and his com *444 petency was highly questionable for lengthy periods. The major factual distinction is that the donor there handed articles of tangible personal property to the donees, whereas, here the donor, without any corroboration from any source and as a result of the sole activities of the donee, signed transfer slips authorizing joint bank accounts with right of survivorship. Also, here we find that the donee did not exercise any control over the several bank deposits until after donor’s death.
We conclude that under the circumstances of this case, that the gifts in question come within the doctrine of the Booth case. The Supreme Court held in the Booth case that it was not necessary to consider whether or not the gifts were inter vivos or causa mortis; however, we note that on petition for rehearing, the Court clearly took into consideration the fact that the gifts held to be invalid were made approximately ninety days prior to death and during a period that donee was imbibing heavily.
The Chancellor in the instant cause had before him a profusion of testimony and documentary evidence, which taken as a whole reflected a miserly old man of eighty-one years, who was vague and possessed of habits not attributable to a person of normal mental capacity; who had never made a gift of anything to anyone; who was confined in a hospital and at times physically restrained; who was suffering from numerous physical ailments, some of which usually adversely affect a person’s mental ability (anemia and uremia); who, during the period of time of making the purported gifts, was being administered the drugs percodan and marsalid (a stimulant) ; who made no declarations to any third person as to his intention of making a gift of any amount to anyone; and who purportedly gave $30,000 within ten days prior to his death, while confined in a hospital and during such confinement, save for medical personnel, saw no one except the donee and his wife, neither being the natural object of the old man’s bounty. Thus, the facts indicate purported gifts causa mortis.
 Gifts causa mortis are not regarded with favor by the law,[5] but are tested by strict rules with which proof of compliance must be clear and convincing and owing to the possibility of fraud, any relaxation of such rules is fraught with danger.[6] The evidence must be much stronger and clearer than proof of a gift inter vivos, there being no presumption of law either in favor of or against a gift causa mortis.[7]
Applying the facts of this cause to the law on the subject of gifts causa mortis, we find that the donee failed to meet the high degree of proof required in such instances.
Having found that the transfers did not constitute gifts causa mortis, we must look further to see if the transfers meet the principles of law applying to gifts inter vivos, which consideration requires a further analysis of the evidence.
The attending physician, Dr. King, testified that he visited George almost daily, and that on the occasions he observed his patient, no problem of mental competency arose in his mind. However, he further testified that he could not make a statement as to whether deceased’s mental capacity was affected during the period April 21 and 22 when his temperature was spiked. He further testified that intense uremia has a “great effect upon a man’s mental capacity” dependent upon the rapidity with which it develops. Dr. King stated that George Kummer had no indications of uremia until five days prior to death; that he (King) was surprised when the NPN test on April 23 was 107.5 (hospital records of April 25 noted NP'N 129); that the *445 patient’s condition indicated “fairly rapidly advancing” uremia, but he could not state whether the uremia advanced rapidly so as to affect the patient’s mental capacity because no NPN test was made when the patient entered the hospital. Weighing this testimony together with a wealth of documentary evidence, including the physician’s own entries upon the hospital records, together with his own declarations which are not rebutted,[8] it is apparent that this testimony fell far short of proving mental competency at the times the several transfers were made.[9]
Next we shall give attention to the testimony of disinterested witnesses to the transfers.
FIRST TRANSFER: Mr. Leroy Northrup, Managing Officer of the Ormond Beach Federal Savings and Loan Association, testified that the transfer of fund in his Association from a single account to a joint account with right of survivorship occurred “several days” subsequent to April 17 but prior to April 27, 1958, the date of death. Mr. Northrup further testified that Mr. Kuhner stated that the purpose of the transfer of the account was “in the event of death.”
SECOND TRANSFER: [Made April 22, in First Federal Savings and Loan Association], As required by this Association, the signing of the transfer request was witnessed by one Ralph Sheppard, an orderly at the Halifax Hospital, who testified that he was reluctant at first, but to the best of his memory Mr. Kuhner told him that the purpose was to get money for Mr. Kummer. Thereupon, a statement signed by Sheppard was introduced in evidence. Therein Sheppard stated that he was reluctant to be a witness, “But the gentleman (Kuhner) assured me that it was only to witness Mr. Kummer’s signature so that Mr. Kummer (emphasis supplied) could get some money.”
THIRD TRANSFER: Mrs. Neva Davis, Savings Officer of the Daytona Beach Federal Savings and Loan Association, testified that Mr. Kummer’s signature on the withdrawal request dated April 25, 1958, didn’t match Mr. Kummer’s signature card so she called Mr. Kuhner and requested another withdrawal slip. At that time Mr. Kuhner told her that Mr. Kummer wanted Mr. Kuhner’s name on his account so he could “pay his hospital bills and medical expenses.” The withdrawal slip was delivered to her and the transfer made on the morning of April 28, 1958, one day after Kummer’s death.
Further evidence adduced by the administrator and not rebutted by Kuhner is material. Mrs. Annabelle Kummer testified that in a telephone conversation on April 27, Kuhner stated the following: that George Kummer had died and his wishes were for him to “take care of everything” and that George wanted to be buried in Florida; that he (Kuhner) needed funds for the funeral; that George had a bank account, but it was so small that he would probably have to buy a shirt out of his own pocket; that he was supposed to sell George’s car; and that she should have her husband Ben write a letter of authorization giving him authority to handle George’s, affairs.
Samuel W. Greer, esquire, attorney for the Kummer family, testified as follows: that he called Kuhner, at the family’s request, on April 28 to grant him permission to proceed with the funeral in Florida,[10] *446 and that Kuhner asked who would pay for the funeral. Greer replied that George had left Butler with approximately $30,000 and his estate was sufficient to take care of the expense and thereupon, Kuhner told him that he knew nothing about George’s money and that George had left only a few personal belongings, a car, and a small balance in a checking account. Greer further testified that subsequently he received a letter from a Florida attorney stating that Kuhner had requested him to contact Greer concerning the hospital, doctor and funeral bills.
It is significant that Kuhner, although he did take the stand and testify in his own behalf, did not rebut nor deny the testimony of the bank officials Northrup and Davis and that of the witness Sheppard as to the purpose of the transfers as stated by Kuhner. Neither did he deny that he told the lawyer Greer that he knew nothing about George Kummer’s money, nor made the statements attributed to him by Mrs. Annabelle Kummer. These statements attributed to the donee and testified to by persons who have no interest in the outcome of the action fall within a rule of evidence long recognized by courts of this state and recently reiterated by this Court in an able opinion by Judge Wigginton,[11] to-wit:
“When uncontradicted testimony consists of facts, as distinguished from opinions, and is not illegal, improbable or unreasonable or contradictory within itself, it should not be wholly disregarded, but should be accepted as proof of the issue.”
The only testimony adduced by appellees to prove donative intent was a self serving declaration by Evan T. Kuhner to one bank official that “Mr. Kummer requested it” and the following testimony of Evan T. Kuhner :
“He [J. George Kummer] said that he wanted to make me a gift of his money and that he wanted to make the account joint with me with right of survivorship, and he did it of his own free will and accord.”
Therefore, the uncontradicted testimony given by the two bank officials and the witness Sheppard clearly stand as proof of the issues.
Appellees insist that in cases such as this, a presumption exists in favor of the donee, primarily relying on the holding in Spark v. Canny[12] where, the Supreme Court was concerned with a gift inter vivos of a joint bank account with right of sur-vivorship. The decedent herself had established with her own funds the joint account with right of survivorship in favor of one daughter. The transfer was made several months prior to her death at a time when there was no question of mental incompetency. The donor was an elderly woman of eighty-three, who had been severely ill for several years prior to her death. The Chancellor found there was no fraud or wrongdoing on the part of Mrs. Canny (donee) “which would alter the above joint account agreement.” The Court, speaking through Mr. Justice Roberts, carefully analyzed the law to be applied to such accounts, and held that gifts inter vivos made by means of establishing a joint bank account with right of survivorship, by their very nature render inapplicable the rules of delivery and of surrender of dominion and control by the donor; but that the third element of a gift inter vivos — that of dona-tive intent — is just as relevant as it is in cases involving the establishment of a bank account by a person with his own funds in the name of another. Citing: McKinnon *447 v. First Nat. Bank of Pensacola, 77 Fla. 777, 82 So. 748, 6 A.L.R. 111, and King v. King (Fla.1951) 55 So.2d 181. The Court reversed the Chancellor, finding that a presumption existed in favor of this type of gift, but that it could be overcome by clear and convincing evidence to the contrary; and that such had been done since the evidence conclusively showed that the joint bank account had been established by the donor solely for her own convenience (to allow survivor to pay decedent’s hospital, doctor and nursing bills, and other expenses) and without any donative intent.
The Spark case dealt with particular facts, all involving a gift inter vivos and stands for one principle of law pertaining to gifts of joint bank accounts with right of survivorship. There are other principles of law of this jurisdiction relating to inter vivos gifts of this type and applicable to the factual circumstances of the instant case.
Garner v. Bemis [13] involved a claim of gift which was not asserted until after the death of the alleged donor and it was held therein that under such circumstances the donee must prove by clear and satisfactory evidence every element requisite in a gift.
In Rich v. Hallman[14] the Supreme Court found that where a confidential relationship exists between the donor and the donee, undue influence is presumed, and the burden is on the donee to show that the gift was not procured by undue influence, deceit or other improper means; and that “equity * * * will allow no transaction between the parties to stand if the one who profits from the one trusting him conceals anything in his breast.”
In Chase Federal Savings and Loan Association v. Sullivan[15] it was held that where a joint bank account with right of survivorship is the subject of a gift, there must exist an intention that each party shall have a present, equal right to withdraw the funds, but where the intention of the donor is to make the gift effective upon death, the establishment of the joint bank account is an ineffectual attempt to do that which could only be accomplished by last will and testannent.
With the foregoing principles in mind we have carefully reviewed the several hundred pages of testimony and conclude that the evidence taken as a whole unquestionably reveals that Kuhner made no assertion before death of any gift and disclaimed any knowledge of the $30,000 involved after death, and had ample opportunity to assert undue influence upon him; and, therefore, it was incumbent upon Kuhner in this cause to assume the burden of proof of each essential element of the purported transfers. The record is silent of any such proof being tendered by him. Conversely, the overwhelming proof of the administrator negates any theory that a valid gift was intended or made by the donor. However, for purposes of argument, assuming that the doctrine of the Spark v. Canny case applies, i. e., “that a presumption existed in favor of donee that the transfers constituted valid gifts”, we find that the administrator, by clear and convincing evidence overcame such a presumption and conclusively proved the lack of donative intent in two of the transfers and an attempted testamentary disposition by the donor in the third transfer.
Accordingly, the decree herein is reversed with directions to enter a decree in favor of the appellant.
STURGIS, J., concurs and WIGGIN-TON, Acting Chief Judge, specially concurs.

. The testimony was taken before a special examiner, and it is noted that onr opportunity to evaluate the evidence is the same as that of the Chancellor, since he did not hear the witnesses. Spark v. Canny, 88 So.2d 307 (Fla.1956).

. In re Thompson’s Estate, 145 Fla. 42, 199 So. 352 (1940).

. Mayer v. Mayer, 54 So.2d 103 (Fla.1951).

. Booth v. Cureton, 81 So.2d 662 (Fla.1955).

.Szabo v. Speckman, 73 Fla. 374, 74 So. 411, L.R.A.1917D, 357 (1917).

. Heyser v. Crane, 144 Fla. 663, 198 So. 472 (1940).

. 38 C.J.S. Gifts § 116a.

.Annabelle Kummer, a sister-in-law to George, testified that she called Dr. King long distance on April 22 to inquire about George Kummer and the doctor told her it was not necessary for the two brothers to come down to Florida because they could not help since George might not know them as he was confused. She further testified that she called Dr. King again on April 25 and was told George Kummer was some better, still critical but confused.

. Booth v. Cureton, supra, note (4).

. There is extensive testimony concerning the Kummer family’s desire to bury *446 George in Pennsylvania and Kuhner’s insistence that George’s wishes were to be buried in Florida.

. Kinney v. Mosher, 100 So.2d 644 (Fla.App.1958).

. Spark v. Canny, 88 So.2d 307 (Fla.1956).

. Garner v. Bemis, 81 Fla. 60, 87 So. 426 (1921).

. Rich v. Hallman, 106 Fla. 348, 143 So. 292 (1932).

.Chase Federal Savings & Loan Association v. Sullivan, 127 So.2d 112 (Fla.1960).